# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
WAYNE PESTKA, Special          *       No. 06-708V
Administrator of the Estate of *
KELSEY LYNN SHORT, deceased,   *       Special Master Christian J. Moran
                               *
                               *       Filed: March 25, 2015
            Petitioner,        *
                               *
v.                             *       Attorneys' fees and costs,
                               *       reasonable hourly rate for attorney,
SECRETARY OF HEALTH            *       reasonable number of hours,
AND HUMAN SERVICES,            *       costs for experts, responsibility for
                               *       unreasonable costs.
            Respondent.        *
* * * * * * * * * * * * * * * * * * * *
```

<u>Robert T. Moxley</u>, Robert T. Moxley, P.C., Cheyenne, WY, for petitioner;
<u>Michael P. Milmoe</u>, United States Dep't of Justice, Washington, DC, for
respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

     After two hearings, Mr. Pestka received compensation on his claim in the
Vaccine Program.  Thus, by right, he is an entitled to an award of his reasonable
attorneys' fees and costs.  The parties, however, dispute the reasonable amounts for
the attorneys' fees and the attorneys' costs.  **For reasons explained below, Mr.
Pestka is awarded $123,188.16.**

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17,
2002), requires that the Court post this decision on its website.  Pursuant to Vaccine Rule 18(b),
the parties have 14 days to file a motion proposing redaction of medical information or other
information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special
master will appear in the document posted on the website.

## PROCEDURAL HISTORY

The parties' positions regarding the amount of attorneys' fees and costs are based on events in this case's history.  As discussed below, the chronology is lengthy and the case's duration contributes to both the amount of Mr. Pestka's request and the Secretary's objections.  For ease of organization, the litigation is divided into three phases.  These are:  events from the initial attorney involvement until the first entitlement hearing, events after the first hearing through the end of the merits case, and events concerning attorneys' fees.

### Activities from the Petition to the First Entitlement Hearing

Represented by Attorney Robert Moxley, Mr. Pestka filed his petition and six medical records in October 2006.  Mr. Pestka is the special administrator of the estate of Kelsey Short.  On behalf of Kelsey's estate, Mr. Pestka alleged that a dose of the flu vaccine given to her in 1998 injured her and a dose of the flu vaccine given to her in 1999 led to her death.  Over the next six months, Mr. Pestka filed additional medical records.

When this process was completed, the Secretary filed her report pursuant to Vaccine Rule 4 on June 12, 2007.  She maintained that Mr. Pestka was not entitled to compensation because, among other reasons, he had not produced the report of an expert stating that the flu vaccine caused either Kelsey's disease in 1998 or her death in 1999.

Mr. Pestka submitted the first report of his first expert, Dr. Marcel Kinsbourne, on February 11, 2008, approximately 16 months after the petition was filed.  Dr. Kinsbourne opined that the flu vaccine caused Kelsey's 1998 injury and her 1999 death.  Exhibit 14.  In addition to writing a report, Dr. Kinsbourne assisted Mr. Moxley in identifying other doctors who might offer opinions.  In September 2008, Mr. Pestka filed the first report from a second expert, Dr. Patrick Barnes, and the first report from a third expert, Dr. M. Anthony Verity.

On December 1, 2008, the Secretary filed reports from two experts.  Dr. Lucy Rorke-Adams, a pediatric neuropathologist, disagreed with the assertion that the 1999 flu vaccination caused Kelsey's death.  Dr. Neal Halsey, an expert in pediatric infectious diseases, disagreed with the opinions presented by Dr. Kinsbourne.  Dr. Halsey disclosed his opinion that before Kelsey's death, she suffered an "anoxic encephalopathy," which the flu vaccine did not cause.  Exhibit A at 6.

The parties volleyed additional expert reports back and forth.  The parties' efforts to settle the case were not successful.  Thus, the parties presented testimony from these doctors at a hearing held on March 18-19, 2010.

## Activities from the First Entitlement Hearing to Judgment

Following the hearing, the undersigned issued an order stating "The evidentiary record is closed.  If a party wishes to file any additional evidence, the party should request a status conference before submitting the evidence."  Order, issued May 4, 2010.

This May 4, 2010 order also required the parties to file briefs.  Mr. Pestka filed his brief on July 16, 2010, and the Secretary filed her brief on October 21, 2010.  With his reply brief, Mr. Pestka filed "newly discovered evidence" on November 30, 2010.  The Secretary responded to this new evidence and the parties were ordered to file supplemental briefs.  Order, issued Mar. 16, 2011.  The parties filed those briefs on April 28, 2011.  In conjunction with his supplemental brief, Mr. Pestka submitted an offer of proof on May 2, 2011.

While the parties were filing post-hearing briefs, Mr. Pestka filed, on April 11, 2011, a motion for an award of attorneys' fees and costs on an interim basis.  After more briefing and evidentiary development on that motion, an Interim Fee Decision was issued on August 30, 2011.  2011 WL 4433634.  The Interim Fee Decision awarded compensation for the work Mr. Moxley performed before June 2008, and for the routine costs that had been incurred by Mr. Pestka and Mr. Moxley.  The Interim Fee Decision also deferred any adjudication of attorneys' fees for work performed after June 2008 and any award for the costs of the experts until a final application.

Mr. Pestka's May 2, 2011 offer of proof altered the course of litigation and, as explained below, is a basis for the Secretary's primary objection to the pending request for attorneys' fees and costs.  Mr. Pestka requested an opportunity to present additional evidence regarding the Secretary's position that a "cardiovascular collapse" caused Kelsey's death.  Pet'r's Offer of Proof at 1, ¶ 2.  The parties were again instructed not to file additional evidence.  Order, issued June 6, 2011.  Nevertheless, following a status conference, Mr. Pestka submitted a

letter from Steven Baisch, a doctor who cared for Kelsey the day before she died. Exhibit 58.[2]

Although Mr. Pestka filed Dr. Baisch's report after he had been directed not to file additional evidence, the Secretary did not move to strike it from the record. However, the Secretary did note a concern about this late submission:

> [T]he timing of petitioner's filing is indeed unfortunate given that the hearings in this matter were held in March, 2010, and the final briefing on the issue of entitlement was completed in December, 2010. . . . In short, the information from Dr. Baisch could have been, and should have been, presented at the hearings in 2010. Petitioner's failure to produce such evidence until sixteen months after the hearings in the matter has not been adequately explained by petitioner.

Resp't's Status Rep., filed July 19, 2011.

Because Mr. Pestka had submitted a report from Dr. Baisch that was prepared for litigation, the undersigned scheduled a hearing to provide the Secretary with an opportunity to question him. This hearing took place, via videoconferencing, on January 5, 2012.

The Secretary's experts responded to the new evidence, Dr. Baisch's report, and testimony. Exhibit V (Dr. Halsey); exhibit X (Dr. Rorke-Adams). Mr. Pestka replied with another letter from Dr. Baisch (exhibit 60), a report from Dr. Verity (exhibit 61), and a report from Dr. Kinsbourne (exhibit 62).

---

[2] Because the evidentiary record was closed but the case had not been decided, Mr. Pestka should have filed a motion to reopen the record. See Moore's Federal Practice § 59.13[3][c] (distinguishing motion to reopen from a motion for a new trial). Special masters have discretion in determining whether to reopen the record and the relevant factors are similar to the factors used in evaluating a motion for relief from final judgment. See Erve v. Sec'y of Health & Human Servs., 39 Fed. Cl. 607, 612 (1997) (finding special master abused his discretion in denying the government's motion to reopen), mot. for rev. denied after remand, 43 Fed. Cl. 338 (1999), aff'd, 232 F.3d 914 (Fed. Cir. 2000) (table); but see Hanlon v. Sec'y of Health & Human Servs., 40 Fed. Cl. 625, 629 (1998) (looking at "facts and circumstances" surrounding the decision to reopen without using a four-part test), aff'd on other grounds, 191 F.3d 1344 (Fed. Cir. 1999).

The two trial attorneys reached a tentative agreement to resolve the case in January 2013.  On October 29, 2013, judgment awarding Mr. Pestka $175,000 was issued.[3]

<u>Activities relating to Application for Attorneys' Fees and Costs</u>

The process of submitting the pending fee application has been almost as complicated.  After initially attempting to reach an informal compromise with the Secretary, Mr. Pestka filed a motion for attorneys' fees on April 25, 2014.  This submission included an affidavit from another attorney, Fred Harrison.  Exhibit 65. Although the April 25, 2014 submission placed the matter on the docket, Mr. Pestka's motion was not complete.  He supplemented it on July 3, 2014, by adding seven exhibits.  The Secretary opposed this submission on July 21, 2014.  Mr. Pestka replied on August 4, 2014.

Although Mr. Pestka's reply would typically end submissions, Mr. Pestka requested a status conference to discuss the pending application.  This status conference was held on October 10, 2014.  On December 17, 2014, an order required Mr. Pestka and Mr. Moxley to provide additional information.[4]  They filed their response on December 22, 2014, making the matter ready for adjudication.

## STANDARDS FOR ADJUDICATION

Like other litigation allowing an award of attorneys' fees and costs, awards for attorneys' fees and costs in the Vaccine Program must be "reasonable."  42 U.S.C. § 300aa–15(e)(1).  Reasonable attorneys' fees are determined using the lodestar method – "'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  <u>Avera v. Sec'y of Health & Human Servs.</u>, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 888 (1984)).

---

[3] The long interval between the issuance of the 15-week order and the decision was due to complications due to Mr. Pestka's status as a "special administrator" for Kelsey's estate.

[4] Mr. Moxley's response concerned the retainer agreement between Mr. Pestka and his law firm.  The retainer is discussed below in section III.

Quoting a decision by the United States Supreme Court, the Federal Circuit has explained some of the limits on the number of hours for which compensation may be sought:

> The [trial forum] also should exclude from this initial fee calculation hours that were not "reasonably expended." . . . Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (emphasis in original) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983)).

In addition to seeking an award for his attorney's time, Mr. Pestka seeks an award for his attorney's costs. Requests for costs are evaluated by the same standard as the standard for an award for attorneys' fees. Costs must be "reasonable." Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). The fees for an expert are generally determined by multiplying a reasonable hourly rate by a reasonable number of hours. See id.; see also Baker v. Sec'y of Health & Human Servs., No. 99-653, 2005 WL 589431, at *1 (Fed. Cl. Spec. Mstr. Feb. 25, 2005) (discussing factors to determine reasonable expert fees).

## ANALYSIS

This section resolves three issues: (1) a reasonable amount for attorneys' fees, (2) a reasonable amount for costs, and (3) the responsibility for charged, but not awarded, costs. As to the reasonable amount of attorneys' fees, the primary, but not only, dispute concerns the lodestar value for Mr. Moxley's work. For costs, the predominant question is the reasonable value of the work performed by Dr. Kinsbourne, Dr. Verity, and Dr. Barnes. Finally, responsibility for the charged but not awarded costs is examined.

## I.   **Attorneys' Fees**

The parties' pending dispute over attorneys' fees implicates three issues. They are whether the decision that awarded compensation for Mr. Moxley's work from July 2005 to May 2008 should be adjusted, what is the lodestar value for the work that Mr. Moxley performed after May 2008, and whether the lodestar value should be adjusted.

### A.   **Adjustment to the Amount Awarded in Attorneys' Fees for Work Performed before June 2008**

The Interim Fee Decision used the traditional lodestar formula to determine a presumptively reasonable amount of attorneys' fees. The lodestar formula involves multiplying a reasonable number of hours by a reasonable hourly rate. For the reasonable hourly rate, the interim fee decision imported findings from a 2009 decision in which Mr. Moxley represented the petitioner, Masias v. Sec'y of Health & Human Servs., No. 99-697V, 2009 WL 1838979, at *5-13, *45 (Table 6) (Fed. Cl. Spec. Mstr. June 12, 2009), mot. for rev. denied, slip. op. (Fed. Cl. Dec. 10, 2009), aff'd, 634 F.3d 1283 (Fed. Cir. 2011).

After the Interim Fee Decision awarded compensation to Mr. Pestka, Mr. Moxley filed a motion to alter the judgment in Masias. Mr. Moxley argued (and established) that Masias contained a mathematical error that diminished his hourly rate. Masias v. Sec'y of Health & Human Servs., No. 99-697V, 2013 WL 6807060 (Fed. Cl. Spec. Mstr. Jan. 30, 2013).

Therefore, the Interim Fee Decision is founded on a flawed foundation, the 2009 Masias decision. Mr. Pestka has asked that this decision correct the error.

There is no reason to perpetuate the error.  Based upon the calculations reflected in Appendix 1, Mr. Pestka is awarded an additional $808.10.

### B.   Lodestar Value for June 2008 through December 2014

Mr. Pestka's pending motion starts where the interim award stopped — June 2008.  For Mr. Moxley's activities after June 2008, the parties dispute both inputs for the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

### 1.   Reasonable Hourly Rate

Mr. Moxley avers that in 2014, he charged his clients $300 per hour. Exhibit 56A at 6 ¶ 20.  Mr. Pestka also argues that because Mr. Moxley submitted his motion in 2014 for work performed years earlier, the hourly rate should reflect the current billing to account for "systemic delay."  Pet'r's Reply, filed Aug. 4, 2014, at 3.

This is the second time Mr. Pestka has asked that Mr. Moxley be compensated at hourly rates reflecting delay.  He raised the same argument in the context of the application for attorneys' fees and costs on an interim basis.  The Interim Fee Decision rejected that argument based upon two Federal Circuit decisions that indicated that attorneys' fees awarded against the federal government cannot be adjusted to account for delays in payment.  Interim Fee Decision, 2011 WL at 4433634, at *5 (citing Hubbard v. United States, 480 F.3d 1327, 1334 (Fed. Cir 2007), Chiu v. United States, 948 F.2d 171 (Fed. Cir. 1991)).

Those decisions constitute binding precedent until the Federal Circuit determines that they are inconsistent with higher authority.[5]  See Strickland v. United States, 423 F.3d 1335, 1338 n. 3 (Fed. Cir. 2005).  Except in the sense of preserving an issue for appeal, Mr. Pestka's argument is misdirected.

As an alternative to using Mr. Moxley's current billing rate ($300 per hour), Mr. Pestka proposes $250 per hour for work performed from June 2008 through December 2009.  The basis for the $250 per hour figure is a decision from another special master, Avila v. Sec'y of Health & Human Servs., No. 05-685V, 2009 WL 2033063 (Fed. Cl. Spec. Mstr. June 26, 2009), mot. for rev. denied, 90 Fed. Cl. 590 (2009).  Pet'r's Reply at 4.  For all work performed after January 2010, Mr. Pestka

---

[5] Mr. Pestka argues that adjusting the hourly rate to reflect current (not historic) billing rates is compelled by Perdue v. Kenny A. ex rel. Winn, 599 U.S. 542, 566 (2010).

proposes $300 per hour.[6]  The basis for this change from $250 per hour to $300 per hour is not explained.

A reasonable hourly rate for Mr. Moxley's work in 2009 is $247 per hour.  Masias, 2013 WL 6807060, and Friedman v. Sec'y of Health & Human Servs., No. 02-1467V, 2009 WL 4975267, at *9 (Fed. Cl. Spec. Mstr. Dec. 4, 2009), mot. for rev. denied, 94 Fed. Cl. 323 (2010).  This rate is then increased based upon inflation.  After a series of increases, the rate for 2014 is $274 per hour.  See Engels v. Sec'y of Health & Human Servs., No. 07-804V, 2014 WL 2199405, at *1 (Fed. Cl. Spec. Mstr. May 2, 2014) (finding hourly rates for another attorney from Cheyenne, Wyoming, who has experience in the Vaccine Program comparable to Mr. Moxley, and using the inflation rate found in the United States Department of Labor, Bureau of Labor Statistics CPI Inflation Calculator).

## 2.    Reasonable Number of Hours

After a reasonable hourly rate of compensation is found, the next step in determining the lodestar is to set the reasonable number of hours.  Here, Mr. Pestka seeks compensation for approximately 250 hours of Mr. Moxley's time after June 2008.

For activities not compensated in the Interim Fee Decision, Mr. Pestka summarized the entries from Mr. Moxley's timesheets:

| Span of Time | Number of Hours |
|---|---|
| June through December 2008 | 13.4 |
| January 2009 through December 2009 | 25.1 |
| January 2010 through December 2010 | 91.3 |
| January 2011 through December 2011 | 63.4 |
| January 2012 through December 2012 | 35.6 |
| January 2013 through December 2013 | 14.0 |
| January 2014 through March 2014 | 3.9 |
| TOTAL | 246.7 |

Pet'r's Reply at 4-5.[7]

---

[6] There may be a mathematical error in Mr. Pestka's calculations for 2010 because it appears that he used $298 per hour.

[7] Mr. Pestka submitted two supplemental invoices for work Mr. Moxley performed in litigating the attorneys' fees.  Exhibits 67, 68.

The Secretary argues that such an amount of time is excessive. Resp't's Opp'n at 4-6. The Secretary makes two arguments, one significant and one minor. The significant contention is that Mr. Moxley litigated this case inefficiently because he delayed contacting Dr. Baisch, one of Kelsey's treating doctors, until 14 months after the hearing. A thorough discussion of this issue is deferred until section 3 below.

The Secretary's relatively less significant objection concerns the amount of time Mr. Moxley spent "in coordinating with Dr. Kinsbourne as a 'consulting expert.'" Resp't's Opp'n at 6. In the Secretary's view, because Mr. Moxley is an attorney with a great deal of experience in the Vaccine Program, he should not require the assistance of one doctor to help with other doctors. Id.

Although the Interim Fees Decision encouraged the Secretary to identify examples of activities for which an excessive amount of time is sought, 2011 WL 4433634, at *7, the Secretary did not quantify how much time (or money) was spent on consulting activities. Without specific examples of arguably objectionable time, assessing the Secretary's contention is difficult. In the absence of guidance from the Secretary, the undersigned has reviewed the timesheets and did not identify an unreasonable amount of consultation between Mr. Moxley and Dr. Kinsbourne. Thus, with the exceptions discussed below in section 3, Mr. Moxley's activities are reasonable.

A reasonable number of hours is multiplied by a reasonable hourly rate to determine the lodestar value. Appendix 2 contains the relevant calculations. The result is $71,007.97.[8]

The lodestar value may be compared to the amount awarded in attorneys' fees in similar cases to check whether it is reasonable. Broekelschen v. Sec'y of Health & Human Servs., 102 Fed. Cl. 719, 731 (2011); see also Saxton, 3 F.3d at 1517. The undersigned has reviewed the amounts he has awarded in cases in which a hearing was held. The amount of attorneys' fees was consistently lower in those other cases, but not shockingly different. This comparison, therefore, supports the finding that the lodestar result ($92,291.34) is reasonable, albeit on the high end of the spectrum.

---

[8] For attorneys' fees for work performed before June 2008, Mr. Pestka received $21,175.27. Interim Fees Decision, 2011 WL 4433634, at *1.

### 3.    Adjustment to the Lodestar Value

After special masters determine the lodestar value, they "may then make an upward or downward departure to the fee award based on other specific findings." Avera, 515 F.3d at 1348. For ease of organization, the Secretary's primary objection to the number of hours is being placed here.[9]

As foreshadowed in the Secretary's July 19, 2011 status report submitted shortly after Mr. Pestka presented Dr. Baisch's letter, the Secretary argues that Mr. Moxley's approach to litigation was inefficient. The lack of efficiency flows from the following chronology. Before the March 18-19, 2010 hearing, Dr. Halsey had disclosed his opinion that Kelsey's death came from an anoxic encephalopathy. More than year after the hearing, Mr. Moxley obtained and filed Dr. Baisch's letter to rebut Dr. Halsey's opinion. Dr. Baisch's letter required the holding of a second hearing and the writing of supplemental expert reports.

The Secretary argues that a more prompt production of Dr. Baisch's letter would have significantly diminished the time required to resolve the case.

> The failure to timely identify this witness calls into question all the time spent by petitioner's counsel and petitioner's experts, both after the witnesses' letter was filed, and before the letter was filed. Had petitioner's counsel contacted Dr. Baisch early in the proceedings, it is not unreasonable to believe that the case might have been resolved by decision of the special master, or settlement of the parties, years earlier. While Dr. Halsey's report concerning anoxic encephalopathy was responding to Dr. Kinsbourne's expert initial report, had the court and respondent had the information from Dr. Baisch, it is quite possible that petitioner would only [have] needed to consult with the treating physician and obtained his letter at that time, rather than having to retain later experts (Drs. Verity and Barnes), or having Dr. Kinsbourne file multiple supplemental reports.

---

[9] Consistent with the associative property of multiplication, the order of presentation does not affect the outcome. For example, 4 x 8 x 0.5 yields the same product (16) as 4 x 0.5 x 8. This section could have been incorporated into the section on reasonable number of hours and the same result would have occurred.

The Secretary's proposed remedy is bold:  "Respondent urges the special master to apply a substantial reduction, perhaps a significant percentage of all hours billed since the filing of Dr. Halsey's report."  Resp't's Opp'n at 4-5.

Mr. Pestka responds that Mr. Moxley's work was reasonable.  In the petitioner's view, the petitioner needed to retain three experts (Drs. Kinsbourne, Verity, and Barnes) and to present Dr. Baisch's opinion.  Mr. Pestka argues that the Secretary's and Dr. Halsey's suggestion of anoxic encephalopathy was without support in the medical records, "bogus," "illogical," and "fraudulent."  Pet'r's Reply at 10-11.[10]  Mr. Pestka also maintained that Dr. Baisch's opinion facilitated settlement "because the government's expert Dr. Halsey had been painted into a corner."  Id. at 10.  Mr. Pestka made a similar argument during the October 10, 2014 status conference, asserting that Dr. Baisch was valuable only after Dr. Halsey testified.

Mr. Pestka's argument is long on rhetoric and short on analysis.  See Dougherty v. Sec'y of Health & Human Servs., No. 05-700V, 2011 WL 5357816, at *19 (Fed. Cl. Spec. Mstr. Oct. 14, 2011) ("[t]his writing style may serve as an outlet for counsel's frustration, but it ignores the *relevant* legal issues and poorly advocates his *client's* case")(emphasis in original).  Mr. Pestka's extreme criticisms of Dr. Halsey and Dr. Halsey's opinion are meritless.  Kelsey had problems breathing.  Exhibit 4 at 8 (Dr. Baisch's report, dated Nov. 13, 1999).  Thus, there is at least a good faith basis for Dr. Halsey's opinion.[11]  Furthermore, Mr. Pestka has not substantiated in any way her charge that Dr. Halsey had to be pinned down on cross-examination to prevent him from changing his opinion.  Dr. Halsey appeared to be sincere in his belief and nothing suggests that he offered opinions to advance a particular outcome in litigation.[12]

---

[10] Mr. Pestka also argues that "Dr. Halsey was not qualified . . . to address the issues actually presented by the petitioner's experts and the medical records."  Pet'r's Reply at 10 n.12.  Yet, Mr. Pestka did not file a Daubert motion to exclude Dr. Halsey.  When the Secretary proffered Dr. Halsey as an expert in pediatrics, pediatric infectious diseases, and epidemiology, Mr. Pestka did not object.  Tr. 129.

[11] Whether Dr. Halsey's opinion would have been persuasive is a different question.  Because the case resolved, the undersigned did not need to evaluate whether a preponderance of the evidence supported Dr. Halsey's opinion and there is no reason for the undersigned to determine what would have happened if the case did not settle.

[12] Special masters have often credited Dr. Halsey's opinion.  See e.g., Franklin v. Sec'y of Health & Human Servs., No. 99-855V, 2013 WL 3755954, at *12 (Fed. Cl. Spec. Mstr. May 16,

If Mr. Pestka had wanted to produce evidence to contradict Dr. Halsey's opinion, he should have submitted that evidence before the hearing.  Lost Tree Village Corp. v. United States, 115 Fed. Cl. 219, 230 (2014) (denying motion to reopen in part because the government did not provide "any explanation for its failure to pursue its new theory earlier").  "The litigation process rests on the assumption that both parties present their case once, to their best advantage, and allowing a party to revive claims on motions for reconsideration based on facts that could have been argued when the matter was ruled upon negates the role of advocacy in litigation."  Childers v. United States, 118 Fed. Cl. 394, 399 (2014) (denying motion for reconsideration, filed pursuant to Rule 59(a)(1)).

Dr. Baisch's letter and testimony provided insights about Kelsey's condition during her final hours from a doctor who observed her.  This first-hand knowledge often constitutes convincing evidence about what was happening to the injured person.[13]  Mr. Pestka expected that "the government [would] challenge Dr. Baisch's credentials, denigrate his testimony as not being qualified, and [would] discount it in every way."  Pet'r's Reply at 10.  Regardless of whether the Secretary would attempt to undermine Dr. Baisch's opinion, special masters understand that the opinions of treating doctors are "favored."  Capizzano v. Sec'y of Health & Human Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).

In sum, Dr. Baisch's evidence was strong evidence in the petitioner's favor and petitioner should have obtained the evidence much earlier in the case.  From this starting point, the Secretary reasons that if Mr. Pestka had obtained this persuasive evidence earlier, then both parties would have spent much less time

---

2013) ("in general, the presentations of Drs. Wiznitzer and Halsey in this case were more persuasive than that of Dr. Lopez"); Parsley v. Sec'y of Health & Human Servs., No. 08-781V, 2011 WL 2463539, at *11-12 & n.39 (Fed. Cl. Spec. Mstr. May 27, 2011); Baker v. Sec'y of Health & Human Servs., No. 99-653V, 2003 WL 22416622, at *36 (Fed. Cl. Spec. Mstr. Sept. 26, 2003) (describing Dr. Halsey and Dr. Tuomilehto as "two giants in the field of epidemiology whose accomplishments and achievements are extraordinary"), mot. for rev. dismissed, 61 Fed. Cl. 669 (2004), appeal dismissed, 112 Fed. Appx. 35 (Fed. Cir. 2004); White v. Sec'y of Health & Human Servs., No. 98-426V, 2002 WL 1488764, at *2 n.5 (Fed. Cl. Spec. Mstr. May 10, 2002) ("The court is very familiar with Dr. Halsey from previous cases.  He is an extremely knowledgeable and a highly credible expert.").

[13] Mr. Pestka errs when he asserted "Dr. Kinsbourne's analysis of the records provided everything that Dr. Baisch provided."  Pet'r's Reply at 9.  Dr. Baisch added the views of a doctor who treated Kelsey in her final hours.

litigating the case.  Mr. Pestka replied that the Secretary's proposition is an "absurd and fanciful scenario."  Pet'r's Reply at 9.

Again, Mr. Pestka exaggerates.  Comments from a treating doctor are always considered and, in some cases, they provide a basis for the Secretary to resolve the case informally.  It is likely that if Mr. Moxley had procured Dr. Baisch's opinions sooner, both parties would have saved time and expense.

How much time and money could have been saved is impossible to say with precision.  But, it is clear that the filing of evidence from a critical witness more than one year after the hearing was held is not consistent with the best practices of litigation.  This case exemplifies the Vaccine Program's relaxed standards.  The purposes of those relaxed standards are to promote accurate determinations as to whether a vaccine caused an injury and to permit attorneys to represent petitioners easily.

These relaxed standards should not be viewed as endorsing attorneys presenting cases inefficiently.  Mr. Moxley's delay in soliciting information from Dr. Baisch is not readily excused and the delay caused additional time to be expended.[14]  Cf. K-Con Bldg. Systems, Inc. v. United States, 778 F.3d 1000, 1009 (Fed. Cir. 2015) (noting, in the context of case pursuant to the Contract Disputes Act, that "inefficiency plausibly breeds administrative costs").  Mr. Moxley should not be allowed to benefit (in terms of an increased fees) for solving a problem that he created.

For Mr. Moxley's work in 2012, Mr. Pestka seeks compensation for 35.6 hours.  Mr. Moxley's tasks in this year included arranging Dr. Baisch's testimony at a videoconference hearing, developing responses from Dr. Kinsbourne and Dr. Verity in light of Dr. Baisch's testimony, and countering additional responses from Dr. Halsey in light of Dr. Baisch's testimony.  If Dr. Baisch's opinion had been presented either before or during the March 2010 hearing, then this follow-up work would not have been necessary.  This extra work is attributable to how Mr. Moxley litigated the case.  There has been no argument that a client paying for an attorney would pay the attorney to correct work that the attorney did improperly.  Cf. Leroy v. City of Houston, 906 F.2d 1068, 1075 (5th Cir. 1990).

---

[14] Mr. Moxley's delay in obtaining Dr. Baisch's letter likely postponed his client's receipt of compensation, likely forced the Secretary to spend additional money by obtaining supplemental reports from Drs. Rorke-Adams and Halsey, and likely caused this case to consume additional judicial resources.  He is not being asked to pay for these indirect costs.

Consequently, the hours requested by Mr. Pestka for Mr. Moxley's 2012 work will be cut in half.[15]  This finding reduces the lodestar calculation by $4,717.00.

After all the calculations and adjustments, a reasonable value for Mr. Moxley's work after the June 2008 is $66,290.97.  This amount is combined with the amount for the adjustment in interim fees, which is $808.10.  **Thus, Mr. Pestka is awarded $67,099.07** for Mr. Moxley's work.

## II.   Costs

In his April 11, 2011 motion for an award of attorneys' fees and costs, Mr. Pestka included invoices from Dr. Kinsbourne, Dr. Verity and Dr. Barnes.  The Interim Fees Decision declined to award costs for these experts, generally because Mr. Pestka had failed to submit persuasive evidence regarding the reasonableness of their requested hourly rates.  In his pending application, Mr. Pestka renews his request for an award for the work performed by these three doctors.  Mr. Pestka also adds miscellaneous items, which have relatively small costs.

### Dr. Kinsbourne

Dr. Kinsbourne worked on this case from August 2007 to August 2012.  Exhibits 49 and 49A.  Dr. Kinsbourne has charged $31,705.00.  His invoices reflect he worked in two capacities: as a testifying expert and as a consultant.  The following table reflects the undersigned's calculations for the separate tasks Dr. Kinsbourne performed, divided as Dr. Kinsbourne divided them.

---

[15] The Secretary urged "the special master to apply a substantial reduction, perhaps a significant percentage of all hours billed since the filing of Dr. Halsey's report."  Resp't's Resp. at 5.  Because Dr. Halsey's initial reports were filed in December 2008 and February 2009, and because the merits phase did not end until the beginning of 2013, respondent's argument places at risk approximately $50,000.00 of Mr. Moxley's fees.  Although the Secretary's contention has some logical basis, it too readily assumes that the case would have settled quickly in 2009.

| Dr. Kinsbourne | | | |
|---|---|---|---|
| Role | Charge Per Hour | Number of Hours | Subtotal |
| Testifying Expert | $500 | 48.2 | $24,100.00 |
| Consultant | $300 | 25.35 | $7,605.00 |
| Total | | | $31,705.00 |

The Secretary objected to the number of hours that Dr. Kinsbourne spent as a consultant.  The Secretary argued:  "the number of hours should be reduced by at least 50% as at least half the hours [Dr. Kinsbourne] expended were spent as a consulting expert in coordinating with petitioner's counsel and other experts."  Resp't's Resp. at 8.

The basis for the Secretary's statement is unclear.  When the time for the activities for which Dr. Kinsbourne charged $300 per hour is added, the result shows that Dr. Kinsbourne's consultant role was only about one-third of his total number of hours.  The Secretary may have implicitly reclassified some activities for which Dr. Kinsbourne charged $500 per hour (his rate as a testifying expert) as activities for which Dr. Kinsbourne should have charged $300 per hour (his rate as a consultant).  If so, the Secretary should have explained her calculations more clearly.  In any event, there appear to be relatively few activities that even arguably should have been reclassified at lower rate.[16]

Overall, Dr. Kinsbourne's bifurcated billing practice is reasonable.  Sometimes, Dr. Kinsbourne has used the $300 per hour rate when he could have used the $500 per hour rate.  For example, in October and December 2007, he sent emails informing Mr. Moxley about his progress in completing his initial report.  These small tasks (0.2 hours in total) were functions of his role as a testifying expert.  Thus, Dr. Kinsbourne could have requested a higher rate.  While these two examples amount to less than $100, they demonstrate that Dr. Kinsbourne used some judgment about how to bill his time.

Moreover, Mr. Pestka has persuasively explained that Dr. Kinsbourne's consulting role was to make the petitioner's "presentation scientifically and medically coherent."  Pet'r's Reply at 5.  His consultant work was tied directly to

---

[16] Examples might include the time Dr. Kinsbourne spent in reviewing Dr. Verity's first report (0.25 hours in September 2008) and supplemental report (0.5 hours in January 2010).  But, Dr. Kinsbourne charged a small amount of time.

this case, not management of many cases.  For all these reasons, Mr. Pestka has established the reasonableness of Dr. Kinsbourne's request.

Dr. Verity and Dr. Barnes[17]

Mr. Pestka has submitted three invoices for Dr. Verity.  Exhibits 52, 52A, 52B.  <u>See</u> Pet'r's Status Rep., filed Dec. 22, 2014, at 3-4.  Collectively, they show that Dr. Verity has requested compensation totaling $10,770.00.  He has worked approximately 32 hours and charged between $300 per hour and $400 per hour depending upon the task performed and when the task was performed.

Mr. Pestka has filed two invoices from Dr. Barnes, both contained in exhibit 43.  Dr. Barnes spent 10.75 hours and has sought compensation at a rate of $500 per hour.  Dr. Barnes's invoice totals $5,375.00.  Exhibit 43; <u>see also</u> Pet'r's Status Rep., filed Dec. 22, 2014, at 2.

When presented with these invoices as part of the application for an award of attorneys' fees and costs on an interim basis, the Secretary argued that the hourly rates requested were "unjustified."  Resp't's Resp., filed April 25, 2011, at 10.  The Interim Fee Decision, in turn, credited this argument finding that Mr. Pestka had failed to identify persuasive evidence supporting the reasonableness of the proposed rate.  The Interim Fee Decision, therefore, deferred adjudication of the issue and permitted Mr. Pestka to file additional evidence.

The evidence currently supporting the reasonableness of the hourly rates consists of an affidavit from Mr. Moxley (exhibit 56A ¶ 21) and affidavits from two other attorneys, Mr. Barry MacBan (exhibit 44) and Mr. Frederick J. Harrison (exhibit 65).[18]  Mr. MacBan's affidavit attests that $500 per hour is a reasonable hourly rate for Dr. Barnes.  Mr. MacBan does not address Dr. Verity's hourly rate.  Exhibit 44.  Mr. Harrison states that $500 per hour is a reasonable rate for medical experts and is less than the hourly rate usually charged in Wyoming, where both Mr. Moxley and he practice law.  Exhibit 65 at 3-4 ¶ 13.

---

[17] The Secretary's challenges to the costs submitted by Dr. Verity and Dr. Barnes concern the hourly rate they have requested.  Because the arguments largely overlap, Dr. Verity and Dr. Barnes are treated together.

[18] Although Mr. Pestka also cited Mr. Moxley's first affidavit as supporting the hourly rate the experts propose, Mr. Moxley actually attested to the reasonableness of his own hourly rates, not the hourly rates of the doctors.  <u>See</u> exhibit 56.

The Secretary did not address these affidavits specifically. Instead, the Secretary maintained that Mr. Pestka "has failed to present any evidence supporting the hourly rates of his experts." Resp't's Resp. at 7. The Secretary proposed that the special master deny the request entirely due to petitioner's failure to submit adequate documentation or compensate the experts at an hourly rate of $300 per hour, the lowest rate used by any of the experts.

Denying all compensation due to a failure to establish the reasonableness of the proposed hourly rates would not be unreasonable. It is ironic that Mr. Moxley, who complained that the Vaccine Program "pinches pennies and denies reimbursement so often and with such regularity" (exhibit 56A at 7, ¶ 23) failed to submit stronger evidence regarding the reasonableness of hourly rates. Many of Mr. Moxley's attacks on how special masters award attorneys' fees and costs could be avoided if he, as the petitioner's attorney, simply submitted more persuasive evidence.

Nevertheless, it is not correct to say – as the Secretary argued --- that Mr. Pestka failed to present "any evidence." Mr. Pestka did file some evidence: the affidavits of Mr. Moxley, Mr. MacBan, and Mr. Harrison. Thus, there is not a complete absence of proof regarding the reasonableness of hourly rates, which, in appropriate cases, could justify a complete denial of fees.

A reasonable hourly rate for Dr. Verity is $300 per hour. It was acceptable to Dr. Verity for his work in 2008. See exhibit 52 (invoice, dated May 26, 2009). While Dr. Verity increased his hourly rate in 2009 to $400 per hour, he did not give any reason for this 33 percent increase. See exhibit 52A (invoice, dated May 5, 2010). While it might be assumed that inflation accounts for a small portion of this jump in hourly rates, none of the affiants justified the increase with inflation. Consequently, Dr. Verity will be compensated for all work at $300 per hour.

This finding results in a reduction of $1,200.00 in costs for Dr. Verity.

In contrast to Dr. Verity whose requested rates increased during the litigation, Dr. Barnes has consistently requested compensation at $500 per hour. Dr. Kinsbourne has been compensated at this rate for his expert work for many years. See Simon v. Sec'y of Health & Human Servs., No. 05-941V, 2007 WL 623833, at *1 (Fed. Cl. Spec. Mstr. Feb. 21, 2008).

Dr. Barnes will also be compensated at $500 per hour for several reasons. First, evidence, particularly Mr. MacBan's affidavit, supports an award at this rate.

Second, Dr. Barnes is a neuroradiologist.  Exhibit 29 (curriculum vitae) at 1.  This specialty may command higher hourly rates.  See Marin v. United States, No. 06 Civ 552, 2008 WL 5351935, at *2 (S.D.N.Y. Dec. 22, 2008) (finding $400 per hour for preparation time and $550 per hour for deposition time reasonable for a neuroradiologist).   Third, Dr. Barnes spent relatively few hours.  He spent less than 4 hours reviewing images and preparing his first report.  The relatively small number of hours suggests that Dr. Barnes worked efficiently and special masters have often associated high hourly rates with efficiency.  Simon, 2008 WL 623833, at *7.  Finally, Dr. Barnes's total invoice is less than $6,000.00, which is a small amount for an expert witness who participated in a hearing.

Mr. Pestka has established the reasonableness of Dr. Barnes's invoice.  He will receive compensation in full.

## Additional Items of Costs

Mr. Pestka has also requested reimbursement of routine costs that Mr. Moxley has incurred.  Exhibit 51A.  His submission is confusing because it repeats items that were compensated in the Interim Fees Decision.  A detailed review indicates that the previously unrequested items are postage and copying fees, fee for videoconference to allow Dr. Baisch to testify, and the fee for attorneys to establish Kelsey's estate.  See Resp't's Resp. at 9-10; Pet'r's Reply at 3 n.3, 4.

 The postage and copying fees were not included in the invoice submitted in conjunction with the application for interim fees.  Compare exhibit 51 with exhibit 51A.  However, the documents supporting the charges were.  Thus, Mr. Pestka has established the reasonableness of these charges totaling $1,247.63 (exhibit 51A at 3).

The Secretary objected to the charge for the videoconferencing due to lack of documentation.  Resp't's Resp. at 10.  In reply, Mr. Pestka did not address this omission.  Thus, the request for videoconferencing ($475.00) is eliminated.

Finally, Mr. Pestka requested compensation for the attorneys who established an estate for Kelsey.  The amount requested is $8,184.46.  The firm adequately documented its activities and the Secretary did not object to the amount requested.  Mr. Pestka is awarded this amount in full.

## Summary

The following chart shows how much was requested and how much is awarded.

| Summary of Costs | | |
|---|---|---|
| Item | Requested | Awarded |
| Dr. Kinsbourne | $31,705.00 | $31,705.00 |
| Dr. Verity | $10,777.00 | $9,577.00 |
| Dr. Barnes | $5,375.00 | $5,375.00 |
| Video conference | $475.00 | $0.00 |
| Copying | $1,247.63 | $1,247.63 |
| Estate attorney | $8,184.46 | $8,184.46 |
| TOTAL | $57,764.09 | $56,089.09 |
| Difference | | $1,675.00 |

As reflected in this chart, Mr. Pestka will not receive all of the amounts that he requested.  This case raises the question of what happens to this remainder.

## III.    Responsibility for Charged, but Not Awarded, Costs

As part of his final application for an award of attorneys' fees and costs, Mr. Pestka requested $57,764.09 in costs.  For the reasons explained above, a reasonable amount is slightly lower, $56,089.09.

In Mr. Moxley's supplemental declaration, he asserted that the retainer between his firm and Mr. Pestka "makes the petitioner liable for costs incurred, and requires Kelsey Short's estate to reimburse the experts used in this case for any expert fees incurred in the service of [the] petitioner, over and above what this tribunal awards."  Exhibit 56A at 1 ¶ 3.[19]  This assertion appeared to conflict with section 15(e)(3) of the Vaccine Act as interpreted by Beck v. Sec'y of Health & Human Servs., 924 F.2d 1029 (Fed. Cir. 1991).

---

[19] Although the retainer was not actually submitted, Mr. Moxley included a two-paragraph excerpt from it with the declaration submitted to support an award of attorneys' fees and costs on an interim basis.  Exhibit 56 at 3 ¶ 7.

In the Vaccine Act, the paragraph regarding attorneys' fees contains three numbered sub-paragraphs.  Sub-paragraph (1) generally authorizes awards of "reasonable" attorneys' fees.  Sub-paragraph (2) permits a Vaccine Program award to include attorneys' fees and costs incurred in a civil action filed before October 1, 1988.[20]  Sub-paragraph (3) states:  "No attorney may charge any fee for services in connection with a petition filed under section 300aa–11 of this title which is in addition to any amount awarded as compensation by the special master or court under paragraph (1)."

The Federal Circuit construed these provisions in <u>Beck</u>.  Amanda Beck's father filed, in 1985, a case alleging vaccines were negligently given to her in 1979.  After the creation of the Vaccine Program, Mr. Beck dismissed that case and filed a claim in the Vaccine Program.  In the Vaccine Program, Mr. Beck was awarded approximately $1.2 million in compensation and $30,000.00 in attorneys' fees and costs.  After the attorney requested additional fees pursuant to an agreement between the Beck family and him, the Claims Court disapproved the agreement as against public policy.[21]  <u>Beck</u>, 924 F.2d at 1030-31.  The issue on appeal was whether the Beck's attorney could receive more than $30,000.00 in attorneys' fees and costs.

An argument offered by Beck's attorney in favor of awarding him the additional sums was based on an apparent inconsistency in the statutory language.  "Beck's counsel [drew] a distinction between 'fees' and 'costs' and argue[d] that the prohibition in section 15(e)(3) on collecting 'fees for services' does not prevent him from charging and collecting additional money for 'advanced costs' in connection with Vaccine Act proceedings."  The Federal Circuit acknowledged this argument was "at least superficially plausible."  But, it ultimately held "the only reasonable and consistent interpretation of the terms 'attorneys' fees,' 'costs,' and 'expenses' that is possible is that they are used interchangeably to refer to all

---

[20] For these cases (often called "pre-Act cases" or "retrospective cases"), awards of attorneys' fees and costs were joined with awards for the vaccinee's lost earnings and awards for the vaccinee's pain and suffering.  Collectively, these three items could not exceed $30,000.00. 42 U.S.C. § 300aa–15(b).

[21] In the very early history of the Vaccine Program, special masters issued "reports," which judges of the Claims Court (as the Court of Federal Claims was then called) could adopt (or reject).  The Omnibus Budget Reconciliation Act of 1989; Pub.L. No. 101-239, § 6601(g)-(h); 103 Stat. 2106, 2288-90 (codified at 42 U.S.C. §300aa-12(d)(3)(A), 12-(e)) replaced that system with one in which special masters issue "decisions" that are subject to a motion for review.

expenses of litigation." <u>Beck</u>, 924 F.2d at 1032-33.  Importantly for Mr. Pestka's case, the Federal Circuit concluded "the § 300aa–15(e)(3) cap on collecting any additional 'fee for services' includes advanced costs as well as hourly charges for lawyer time." <u>Id.</u> at 1033.  In this context, the Federal Circuit also rejected the attorney's argument that fees in the Vaccine Program are "too low, resulting in inadequate compensation for attorneys." <u>Id.</u>

The Federal Circuit also held that that the Claims Court possessed jurisdiction to adjudicate the fee request "while the case was before it." <u>Beck</u>, 924 F.2d at 1037.  The Federal Circuit held that voiding of the fee agreement by the Claims Court was correct because "implementation of the agreement would be contrary to the explicit provisions of the Vaccine Act." <u>Id.</u>

Because the retainer between Mr. Moxley's firm and Mr. Pestka appeared to contradict <u>Beck</u>, Mr. Moxley was instructed to provide a response.  Mr. Moxley's direct answer was contained in a footnote that in full, stated:

> Notwithstanding <u>dicta</u> in <u>Beck v. Secretary of DHHS</u>, 924 F.2d 1029 (Fed. Cir. 1991), the Act does not limit the right of a petitioner to contract for the services of an expert by promising to pay an expert's bill.  <u>Beck</u> interpreted § 15 (b) — establishing a $30,000 statutory cap on fees and costs in pre-act cases — to prohibit an attorney from collecting costs from a successful petitioners' award, when the total amount of fees and costs would thereby exceed the statutory cap.

Pet'r's Status Rep., filed Dec. 22, 2014, at 8 n.12.  Mr. Moxley also defended the retainer because, in his view, Mr. Pestka and he "at arm's length, agreed that Mr. Pestka would guarantee full payment to necessary experts.  This freedom of contract was essential for [Mr. Pestka] to obtain the type of services that enhanced the prospect of success or settlement." <u>Id.</u> at 8-9 (footnote deleted without notation).

The characterization of unspecified language in <u>Beck</u> as "dicta" is not persuasive.  Although Mr. Moxley is correct that <u>Beck</u> interpreted § 15(b), <u>Beck</u> also interpreted § 15(e)(3).  The penultimate paragraph in <u>Beck</u> states "§ 300aa–15(e) prevents an attorney from charging or collecting additional fees (including 'costs') from the compensation awarded to a successful Vaccine Act

claimant." Beck, 924 F.2d at 1039.  Nothing in Beck suggests that the Federal Circuit's understanding of section 15(e)(3) depended upon section 15(b).

Effectively, section 15(e)(3) as interpreted in Beck, prevents Mr. Moxley from collecting money from Mr. Pestka that Mr. Moxley could use to pay Dr. Verity.  Although Dr. Verity has sent invoices totaling $10,770.00, this decision finds that the evidence supports a finding that a reasonable amount is only $9,577.00.  In arguing that the Vaccine Act's use of the term "cover" to mean that the Vaccine Program should pay "the entirety of the costs connected with the proceeding" and Vaccine Program should pay "the market price of the services at any rate," Mr. Moxley ignores the word that follows "cover" in the statute: "reasonable."

Even in post-Act cases, which are not subject to the $30,000.00 cap, Congress did not authorize special masters to pay all attorneys' fees and costs.  The express limitation on both fees and costs is that they must be "reasonable."  Perreira, 27 Fed. Cl. at 34.  Furthermore, Congress determined that judicial officers (first special masters and then judges of the Court of Federal Claims) would determine what fees and costs are reasonable.  Mr. Moxley's approach would shift the responsibility for determining the reasonableness of any request from judicial officers to the petitioners, their attorneys, and their experts.[22] A policy change of this magnitude should be made only by Congress.

Congress did not entirely answer the question of who should bear the expense when petitioner has incurred attorneys' fees and (expert) costs that exceed a reasonable amount.  In theory, the responsible party could be the petitioner, the petitioner's attorney, or the petitioner's expert.  In enacting Section 15(e)(3), Congress eliminated one option: the petitioner.

Under these circumstances, Mr. Moxley may not collect any money from Mr. Pestka or reduce the amount paid to him.  Mr. Moxley's compensation is limited to the amount awarded in the Interim Fee Decision and in this decision.

---

[22] As Beck indicates, judicial officers determine the reasonable amount of compensation for petitioner's attorneys and experts, when the Court possesses subject matter jurisdiction over petitioners' claim.  Beck, 924 F.2d at 1036-37.  However, when the Court lacks subject matter jurisdiction over a petitioner's case, special masters lack the authority to determine the amount of attorneys' fees or costs.  Brice v. Sec'y of Health & Human Servs., 358 F.3d 865, 869 (Fed. Cir. 2004) (noting attorney could have entered into a retainer agreement with petitioners, who were appealing a dismissal due to failure to file within statute of limitations).

## IV. Conclusion

**Mr. Pestka is entitled to an award of attorneys' fees and costs, totaling $123,188.16. Of this amount, $115,688.16 shall be payable to Mr. Pestka and Mr. Pestka's law firm and $7,500.00 shall be payable to Mr. Pestka alone.**[23] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing the right to seek review.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master

---

[23] The $7,500.00 figure is derived from Mr. Pestka's April 11, 2011 motion for an award of attorneys' fees and costs on an interim basis, which listed in table 4 Mr. Pestka's personally incurred costs as $9,319.03. The Interim Fee Decision awarded Mr. Pestka $1,819.03. This decision awards Mr. Pestka the balance.

Appendix 1:
Adjustments to Interim Fee Award

| Starting | Ending | Hours Awarded | Hourly Rate - Interim Fee | Hourly Rate - Corrected | Difference |
|----------|--------|---------------|---------------------------|-------------------------|------------|
| July 2005 | March 2006 | 16.6 | 205 | 216 | $ 182.60 |
| July 2006 | April 2007 | 11.3 | 210 | 228 | $ 203.40 |
| June 2007 | May 2008 | 20.1 | 215 | 236 | $ 422.10 |
| TOTAL | | | | | **$ 808.10** |

Appendix 2:

Mr. Moxley's Fees as Requested and Awarded

| Period | Hourly Rate Requested Local / Historical | Hourly Rate Requested / Current | Hourly Rate Awarded | Hours Requested | Amount Requested Local / Historical | Amount Requested / Current | Amount using correct hourly rate and requested hours |
|---|---|---|---|---|---|---|---|
| June 2008 through Dec. 2008 | 250 | 300 | 240 | 13.4 | 3,350.00 | 4,020.00 | 3,216.00 |
| 2009 | 250 | 300 | 247 | 25.1 | 6,275.00 | 7,530.00 | 6,199.70 |
| 2010 | 298 | 300 | 254 | 91.3 | 27,210.00 | 27,390.00 | 23,190.20 |
| 2011 | 300 | 300 | 260 | 63.4 | 19,020.00 | 19,020.00 | 16,484.00 |
| 2012 | 300 | 300 | 265 | 35.6 | 10,680.00 | 10,680.00 | 9,434.00 |
| 2013 | 300 | 300 | 270 | 14.0 | 4,200.00 | 4,200.00 | 3,780.00 |
| 2014 | 300 | 300 | 274 | 3.9 | 1,170.00 | 1,170.00 | 1,068.60 |
| TOTAL | | | | | 71,905.00 | 74,010.00 | 63,372.50 |
| | | | | | | | |
| FEES FOR FEES | | | | | | | |
| Exhibit 67 | | 300 | 274 | 15.10 | | 4,530.00 | 4,137.40 |
| Exhibit 68 | | 300 | 274 | 12.77 | | 3,830.00 | 3,498.07 |
| TOTAL | | | | | | 8,360.00 | 7,635.47 |

AMOUNT AFTER COMBINING MERITS FEES AND FEES FOR FEES

| | |
|---|---|
| Merits: | 63,372.50 |
| Fees for Fees: | 7,635.47 |
| TOTAL | 71,007.97 |

REDUCTION FOR INEFFICIENCY

| | | | |
|---|---|---|---|
| 2012 | 265 | 17.8 | 4,717.00 |

FINAL ADJUSTMENT

| | |
|---|---|
| Combined Amount | 71,007.97 |
| Reduction | (4,717.00) |
| FINAL TOTAL | 66,290.97 |